## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **WILLOWBROOK APARTMENT ASSOCIATES, LLC,** *et al.,* | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| **v.** | * | Civil Case No.: SAG-20-1818 |
| | * | |
| **MAYOR & CITY COUNCIL OF BALTIMORE.,** *et al.,* | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

### MEMORANDUM OPINION

THIS MATTER concerns a lawsuit by housing providers in Maryland ("Plaintiffs"), challenging the constitutionality of laws passed by several localities related to the novel Coronavirus ("COVID-19"). Local governments in Baltimore City, Howard County, and the city of Salisbury passed laws that prevent landlords from increasing rent for their tenants during the pandemic. Plaintiffs claim that these laws are unconstitutional, based on both the United States Constitution and the Maryland Constitution, ECF 1, and move for a Temporary Restraining Order ("TRO") to enjoin their enforcement. ECF 2-1. Defendants filed an opposition, ECF 47, and Plaintiffs filed a Reply, ECF 50. Plaintiffs also submitted "Correspondence," ECF 53, which is addressed in the "Irreparable Harm" section of the opinion. The Court finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons explained below, the Motion for a TRO will be DENIED.

## I.      FACTUAL BACKGROUND

To say that COVID-19 has disrupted the lives of the American people would be an enormous understatement. As of the writing of this opinion, the virus is responsible for more than 125,000 deaths in the United States, which is a fraction of the more than 500,000 deaths around the globe.[1] Apart from the dire health consequences, the virus has devastated many segments of the economy, which has led to a record number of unemployment claims. Marylanders have not been immune from the catastrophic economic effects, with hundreds of thousands of unemployment claims filed in the state since March of this year.

In response, governments at the state, local, and national level have passed legislation and enacted executive orders intended to mitigate some of the most pernicious effects of the virus. One area that has been the focus of particular governmental attention is housing. At issue in this case are laws enacted by three local governments, respectively, which prevent landlords from increasing the rent that they charge to tenants.

On March 5, 2020, Governor Lawrence J. Hogan leveraged his authority under the Public Safety Article of the Maryland Code to declare a catastrophic health emergency in the state of Maryland. *See* Proclamation, "Declaration of State of Emergency and Existence of Catastrophic Health Emergency – COVID-19" (Mar. 5, 2020). Governor Hogan has renewed the declaration with subsequent orders, thus the officially declared health emergency continues. *See* Proclamation, "Renewal of Declaration of State of Emergency and Existence of Catastrophic Health Emergency – COVID-19" (June 3, 2020). The laws at issue in this case rely inherently on the Governor's declaration.

---

[1] Zamira Rahim, "More than 500,000 people have been killed by Covid-19," CNN (June 29, 2020), https://www.cnn.com/2020/06/29/world/coronavirus-death-toll-cases-intl/index.html.

Specifically, the Baltimore City Council passed the Rent Increase Protection Act on May 19, 2020 ("Baltimore City Act"). On May 23, 2020, the Howard County Council passed the Rental Protection & Stability Act ("Howard County Act"), and the city of Salisbury followed suit one week later (on June 1, 2020) with Ordinance No. 2599, which amended chapter 15.26 of the city's Municipal Code ("Salisbury Act").

These laws (the "Acts"), while enacted in different jurisdictions, have the same three fundamental components, which Plaintiffs contend are constitutionally infirm.[2] First, the Acts prohibit housing providers from increasing a tenant's rent during the Governor's declared emergency. *See* Baltimore City Code, Art. 13, § 8-4 ("Rent increases barred"); Howard County Code, Title 17, § 17.1200(B)(1) ("A landlord or mobile home park owner shall not… increase the rent or mobile home park fee"); Salisbury City Code, Title 15, § 15.26.035 ("A landlord may not increase a tenant's rental fee"). Second, the prohibitions void rent increases that have already been agreed by contract, but were scheduled to take effect during the declared emergency. *See* Baltimore City Code, Art. 13, § 8-4; Howard County Code, Title 17, § 17.1200(B)(1); Salisbury City Code, Title 15, § 15.26.35.[3] Finally, each law imposes "notice" restrictions on housing providers. Under the Howard County Act, housing providers may not notify a tenant about an anticipated rent increase during the health emergency, or within a "three-month period" after the emergency declaration expires. Howard County Code, Title 17, § 17.1200(C). The Baltimore City Act and Salisbury Act have similar notice provisions, although each applies for "ninety days" instead of

---

[2] While the Court will employ the shorthand "Acts," the legislation, in reality, took different forms. As Defendants note, the Baltimore City Act is actually a bill, while the Salisbury Act is an ordinance. *See* ECF 47 at 1 n.1 (explaining that the Howard County legislation is the only true "Act").

[3] The parties disagree about whether these provisions are properly characterized as "retroactive." However, the particular verbiage on this issue is immaterial to resolving the present Motion.

three months. Baltimore City Code, Art. 13, § 8-4; Salisbury City Code, Title 15, § 15.26.35(D). While the Acts' duration is expressly predicated on the Governor's emergency declaration related to COVID-19, the Salisbury Act also applies to future health emergencies declared by either the Governor or by the Mayor of Salisbury. Salisbury City Code, Title 15, § 15.26.35(A) (defining "Emergency" as emergencies declared by the Governor or the Mayor).

Plaintiffs are housing providers that own various types of buildings across the state of Maryland. For example, Shawn Avery is the property manager of Willowbrook Apartment Associates, LLC ("Willowbrook"), which itself owns 298 rental units in Baltimore City. ECF 2-2, Exh. 4. Avery submitted an affidavit detailing the effects of the Baltimore City Act on Willowbrook's operations. *Id.* As a result of the Act, 37 rent increases — previously agreed to by renewing tenants — will not take effect. *Id.* ¶ 5. In fact, Willowbrook will be required to affirmatively send written notices to 51 tenants "directing them to disregard a prior rent increase notice." *Id.* ¶ 6.

Similarly, Jane Clauson submitted an affidavit as the authorized representative for Mt. Washington, LLC. ECF 2-2, Exh. 5. According to Clauson, Mt. Washington is burdened by substantially increased expenses during the pandemic, related to business continuity plans, public health incidents, tenant and staff safety protocols, and rising cleaning costs. *Id.* ¶ 8. Moreover, Mt. Washington has been unable to appropriately budget for, *inter alia*, capital improvements, utility costs, and a variety of tax expenses, because of the still-undetermined end date for the Baltimore City Act, and the concomitant gubernatorial emergency declaration. *Id.* ¶¶ 7–8.

Numerous housing providers submitted affidavits articulating the deleterious effect that the Acts had on their business and operations. *See, e.g.*, ECF 2-2, Exh. 7 (declaration by Jane Clauson

regarding the Howard County Act's effect on Tilbury Limited Partnership); ECF 2-2, Exh. 11 (declaration by Kristine Adams regarding the Salisbury Act's effect on Adams Housing, LLC).

## II.    LEGAL STANDARD

A TRO or a preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Wilson v. Williams*, 2019 WL 4942102, at *1 (D.S.C. Oct. 8, 2019). The movant must establish all four elements in order to prevail. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013).

Much like a preliminary injunction, a TRO affords '"an extraordinary and drastic remedy' prior to trial." *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, 2019 WL 2642838, at *6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)); *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted only sparingly and in limited circumstances.") (citation omitted). Since preliminary injunctions are intended to preserve the status quo during the pendency of litigation, injunctions that "alter rather than preserve the status quo" are particularly disfavored. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). Courts should grant such "mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear." *Id.*

III.    ANALYSIS

Plaintiffs have moved for a TRO on the basis of two independent, but related, constitutional claims: (1) the Acts constitute regulatory takings under the Federal Constitution and Maryland Constitution (Counts I, II), and (2) the Acts interfere with vested property rights (Count III). Although the Complaint includes eleven counts in total, ECF 1, this Court will not consider the eight counts that have been temporarily abandoned.[4] *See Antietam Battlefield KOA v. Hogan*, Civil No. CCB-20-1130, 2020 WL 2556496, at *4 (D. Md. May 20, 2020) ("[T]he plaintiffs do not appear to base their motion for a temporary restraining order on these claims, and the court will not address them here.").

Importantly, when deciding whether to grant a preliminary injunction, the court must determine whether the movant has made a strong showing of irreparable harm if the injunction is denied. *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 271 (4th Cir. 2002). If the movant fails to make this showing, then the pursuit of injunctive relief typically comes to an end. *Barnett v. Young*, 2018 WL 3405415, at *2 (S.D. W. Va. June 21, 2018); *see also AIDS Healthcare Found. v. Prince George's Cty.*, Civil No. GJH-14-03029, 2014 WL 4810343 (D. Md. Sep. 26, 2014) (denying request for a TRO after finding lack of irreparable harm).  With these principles in mind, this Court need not evaluate Plaintiffs' likelihood of success on the merits because, as explained below, irreparable harm is clearly lacking in this context.

---

[4] Because of the inherently factual analysis required to assess a Takings claim, they are particularly ill-suited for adjudication on a limited record, such as what the Court confronts here. *See Arkansas Game and Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012) ("[M]ost takings claims turn on situation-specific factual inquiries.") (citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). Certainly, Plaintiffs may continue to assert these claims as the litigation proceeds.

**A. Irreparable Harm**

"Irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Coreas v. Bounds*, Civil No. TDC-20-0780, 2020 WL 1663133, at *13 (D. Md. Apr. 3, 2020) (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 551 F.3d 546, 551 (4th Cir. 1994)). Issuing a TRO "based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a 'clear showing' that the plaintiff is entitled to relief." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 22).

In this case, the nature of Plaintiffs' claims is fatal to their contentions regarding irreparable harm. In their request for a TRO, Plaintiffs primarily allege that the Acts violate the respective "Takings" Clauses in the Federal Constitution and in Maryland's state analog. However, as multiple courts have explained, the proper remedy for a Takings violation is not injunctive relief, but rather monetary damages. *See, e.g.*, *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2176–77 (2019); *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 714–15 (1999) ("[T]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation.") (quoting *Williamson Cty. Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985), *overruled on other grounds*, *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162 (2019)); *Stop the Beach Requirement, Inc. v. Fl. Dep't of Envt'l Protection*, 560 U.S. 702, 741 (2010) (Kennedy, J., concurring) ("It makes perfect sense that the remedy for a Takings Clause violation is only damages, as the Clause 'does not proscribe the taking of property; it proscribes taking without just compensation.") (citation omitted); *Keeler v. Mayor & City Council of Cumberland*, 940 F. Supp. 879, 888 (D. Md. 1996) ("The Fifth Amendment, however, 'is designed not to limit the governmental interference with property rights *per se*, but rather to

secure *compensation* in the event of otherwise proper interference amounting to a taking.")
(quoting *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*, 482 U.S.
304, 315 (1987)).

Indeed, the Supreme Court recently addressed the issue of appropriate remedies, in the
context of a takings claim, in *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162 (2019). That case
concerned a petitioner, Rose Mary Knick, who owned 90 acres of land in a small town in
Pennsylvania. *Id.* at 2168. Because Knick used a portion of her land as a family cemetery, her
property was implicated when the town passed an ordinance requiring that all cemeteries be kept
open to the general public during the daytime. *Id.* Knick argued that the ordinance effected a taking
of her property under the Fifth Amendment, and sought declaratory and injunctive relief in court.
*Id.* at 2168–69. At the outset of the opinion, the majority clarified that a property owner may bring
an action, under 42 U.S.C. § 1983, for a violation of the Takings Clause as soon as the government
takes her property without providing compensation. *Id.* at 2170.[5]  Pertinent here, however, the
Court explained that the appropriate remedy for these claims is not equitable in nature:

> Today, because the federal and nearly all state governments provide just
> compensation remedies to property owners who have suffered a taking, equitable
> relief is generally unavailable. As long as an adequate provision for obtaining just
> compensation exists, there is no basis to enjoin the government's action effecting a
> taking.

*Id.* at 2176.

Accordingly, monetary damages are not only adequate to compensate Plaintiffs for their
alleged injuries, but are also the proper remedy in this context.  Plaintiffs have not established that
monetary damages would be inadequate, nor have they directed this Court to any case in which a

---

[5] The majority overruled *Williamson County Regional Planning Comm'n v. Hamilton Bank of
Johnson City*, 473 U.S. 172 (1985), in which the Court previously held that plaintiffs may not
bring takings claims in federal court until they have pursued available remedies at the state level.

court has remedied a Takings violation with a preliminary injunction — let alone with a TRO. Instead, to demonstrate immediate and irreparable harm, Plaintiffs rely largely on *Henry v. Greenville Airport Commission*, 284 F.2d 631 (4th Cir. 1960). In *Henry*, a civil service employee sued after he was required to move to a segregated waiting area in the Greenville, South Carolina airport. *Id.* at 632. The district court held a hearing on the plaintiff's motion for an injunction, during which it became patently clear that the airport indeed maintained segregated waiting areas. *Id.* Even so, the lower court found that the plaintiff had not met his burden to demonstrate irreparable harm, and, accordingly, denied his motion for injunctive relief. *Id.* On appeal, the Fourth Circuit reversed, explaining that, "The District Court has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right." *Id.* at 633. With the citation to *Henry*, Plaintiffs seemingly imply that courts must determine whether a constitutional violation exists, and, if so, then an injunction must issue as a matter of course. This argument proves too much. *Henry* is not only a per curiam opinion with minimal reasoning, but it also concerned the specific context of civil rights violations in the early 1960's. Plaintiffs' expansive interpretation of that case would render the preliminary injunction factors a virtual nullity, and therefore contradict the Supreme Court's directives as articulated in *Winter*. *See* 555 U.S. 7, 32 (2008) ("The factors examined above—the balance of equities and consideration of the public interest—are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent.").

Notably, in addition to their Takings claim, Plaintiffs also move for a TRO on the grounds that the Acts violate "vested rights." ECF 2-1 at 16–19. Plaintiffs claim, in essence, that the Acts apply "retroactively," thereby vitiating existing contractual rights of housing providers in Maryland. *See id.* at 18 ("[T]here is no dispute that the Acts impair housing providers' contractual

rights to receive rent… As a result of the Acts' plain terms, Plaintiffs have been deprived (and will continue to be deprived) of vested contractual rights in numerous leases."). However, Plaintiffs have not explained why damages would be inadequate or difficult to quantify for this count either. If Plaintiffs successfully prove that the Acts unlawfully deprived them of rental income that they had negotiated with their tenants, then their damages should be readily calculable. In fact, Plaintiffs' contentions mirror a traditional breach of contract claim, and such claims are generally remediable by monetary damages. For instance, United States District Judge William D. Quarles, Jr. denied a motion for a TRO in *Qualls Associates, Inc. v. Mayor and City Council of Baltimore*, 279 F. Supp. 2d 660 (D. Md. 2003). In that case, Baltimore City had entered into a lease agreement with Qualls Associates, whereby Qualls subleased property to non-profit corporations. *Id.* at 661. Baltimore City attempted to repudiate the lease because of Qualls's supposed default, and indicated that a formal eviction was not necessary. *See id.* Judge Quarles found that the alleged injuries, in "nothing more than a contract dispute," were "easily compensable through monetary damages." *Id.* at 661–62.

Even so, in contrast to an archetypal contract dispute, Plaintiffs point out that sections of the Acts allow housing providers to be fined for noncompliance, such as for failing to affirmatively send required notices to tenants, ECF 2-1 at 21–22. Curiously, however, Plaintiffs have not alleged that any of the housing providers in this case has been subject to fines. Regardless, if any Plaintiff is fined for noncompliance, and Plaintiffs ultimately succeed on the merits of their claims, then they should be entitled to monetary damages for those injuries as well.

Finally, at the eleventh hour, Plaintiffs submitted a Declaration from Chaim Kiffel, who operates residential property complexes in four Maryland locations. ECF 53-2, Exh. B.[6]  Kiffel suggests that the economic impact of the Acts "will be difficult to ascertain" because apartment communities employ complicated revenue maximization software that includes rent as a relevant factor. *See id.* at 2. According to Kiffel, "[a]rtificially inhibiting the system from adjusting rents … distorts the setting of economically driven rental rates — but one cannot know precisely how or by how much." *Id.*  This argument is unpersuasive. The crux of Plaintiffs' claims is that they are unlawfully prohibited from (1) asserting new rent increases and (2) imposing rent increases that tenants have already agreed to. At this time, the Court sees no reason why damages could not be quantified by leveraging two primary figures: the amount of each housing provider's intended rent increase, and the length of the Acts' prohibition.[7] This case is quite attenuated from the paradigmatic instances in which monetary damages are difficult to quantify. *See, e.g.*, *Turn and Bank Holdings, LLC v. Avco Corp.*, 2019 WL 4773667 at * 9–10 (M.D.N.C. Sep. 30, 2019) (determining, in a trademark infringement case, that certain injuries would be hard to quantify, including the likelihood of confusion between marks, and the loss of control over the business's reputation). Indeed, Plaintiffs' own Complaint requests "an award of just compensation… [that is]

---

[6] As an initial matter, the argument regarding revenue maximization in Plaintiffs' correspondence, ECF 53, though styled as a "supplemental authority," is actually an improper surreply. *See*  Loc. R. 105.2 (D. Md. 2018) ("Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed."); *see also Mayor and City Council of Baltimore v. Unisys Corp.*, 2013 WL 4833841, at *2 (D. Md. Sep. 10, 2013). Nonetheless, the Court will briefly address the contentions.

[7] Since this Memorandum Opinion addresses only the request for a TRO, Plaintiffs may further develop their contentions about irreparable harm at the preliminary injunction stage. Plaintiffs are welcome, for example, to submit additional evidence about the mathematical algorithm, and any potential impediments to a traditional damage calculation.

sufficient to make Plaintiffs whole by putting them in as good a position pecuniary as if their property had not been taken." ECF 1 at 39.

### B. Balance of the Equities and Public Interest

Finally, even if Plaintiffs had demonstrated irreparable harm, they have not met their burden to establish the remaining preliminary injunction factors, which courts often consider together. *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 602 (4th Cir. 2017), *as amended* (June 15, 2017), *vacated and remanded on other grounds sub nom.*, *Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017) ("As the district court did, we consider the balance of the equities and the public interest factors together.").

This opinion should not be read to minimize the significant harm that has likely been inflicted on Plaintiffs' businesses. Housing providers are not immune from the economic havoc that Covid-19 has wreaked in this state, and across the country. As detailed in affidavits submitted by representatives of the various Plaintiffs, these housing providers depend on regular rental increases in order to meet their own obligations. Moreover, as a result of the pandemic, providing housing has itself become more costly in numerous ways. For example, several of the affidavits explained that cleaning costs have surged dramatically — a quite sensible byproduct of the increased scrutiny placed on landlords' sanitation measures. This Court acknowledges not only the economic devastation to the Plaintiffs, but also the uncertainty about how much longer the Acts at issue will remain in effect. The inability to increase rent, and to fully yield what the market might dictate for a particular property, must feel interminable, particularly where it prevents the entities from budgeting and making accurate financial projections.

On the other hand, this Court is understandably reluctant to disturb legislative enactments, intended to address the needs of Marylanders during a time of sincere desperation. Since March

14, nearly 850,000 Marylanders have filed unemployment claims, with 47,801 new claims filed during the week of June 25, 2020.[8] Baltimore City, Salisbury, and Howard County undoubtedly enacted their respective Acts to provide a much-needed reprieve to those individuals and families that cannot sustain a rental increase during the pandemic. In fact, as Plaintiffs note, Governor Hogan issued an executive order prohibiting the eviction of any tenant who has suffered a significant loss of income. *See* Order 20-04-03-01, "Temporarily Prohibiting Evictions of Tenants Suffering Substantial Loss of Income Due to COVID-19" (Mar. 16, 2020). However, what Plaintiffs overlook is that individuals can be substantially harmed in circumstances falling short of an eviction proceeding.  These local governments have made a determination that, in the midst of an unprecedented global pandemic, Marylanders should not have to absorb *increases* in their rent payments. That point is critical. Plaintiffs are not deprived of the ability to generate any rental income from their properties, but rather may not increase the rents for the time being.

Invalidating the respective Acts could have far-reaching consequences for Maryland residents, including pushing many closer to the brink of financial ruin. While the Court does not doubt the sincerity of Plaintiffs' representations, this case nonetheless involves substantial, delicate, and competing interests. Accordingly, Plaintiffs have not made the requisite showing that equitable considerations, on balance, favor the extraordinary form of relief that they seek at this stage.

---

[8] Jenny Fulginiti, "Unemployment claims in Maryland rise," WBALTV 11 (June 25, 2020), https://www.wbaltv.com/article/unemployment-claims-in-maryland-raises-again-to-over-47801-new-claims-for-june-20/32967450#.

**IV.     CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for a TRO, ECF 2, is DENIED.  A separate Order follows.


Dated: July 6, 2020                                        _____/s/_____

                                                          Stephanie A. Gallagher
                                                          United States District Judge

14