**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **WILLOWBROOK APARTMENT** | * | |
| **ASSOCIATES, LLC,** *et al.,* | * | |
| | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civil Case No.: 20-cv-01818-SAG** |
| | * | |
| **MAYOR & CITY COUNCIL OF** | * | |
| **BALTIMORE,** *et al.* | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

A group of housing providers (collectively, "Plaintiffs") filed an amended complaint challenging the constitutionality of laws passed by three local governments in response to the COVID-19 pandemic. ECF 72. In late May and early June, 2020, Baltimore City, Howard County, and the City of Salisbury (collectively, "Defendants") each enacted temporary legislation restricting landlords from increasing rent or assessing late fees to tenants (collectively, "the Acts"). Plaintiffs claim that the Acts are unconstitutional under both the United States Constitution and the Maryland Constitution. *Id.* The parties agreed to file expedited cross-motions for summary judgment on the issue of liability only. Accordingly, the Defendant filed a motion for summary judgment (the "Motion"), ECF 91, and the Plaintiffs filed two cross-motions for summary judgment (collectively, the "Cross-Motions")—one by plaintiffs who have claims against Baltimore City and Howard County, ECF 97, and the other by plaintiffs who have claims against the City of Salisbury, ECF 98.[1] The City of Salisbury filed a combined reply in support of the

---

[1] The group of plaintiffs with claims against the City of Salisbury filed separately because the City of Salisbury rescinded its iteration of the law at issue on May 10, 2021, whereas Baltimore City's

Motion and opposition to the cross-motion against it, ECF 99.  Baltimore City and Howard County similarly filed a combined reply and opposition, ECF 100.  Finally, the Plaintiffs jointly filed a reply in support of their Cross-Motions, ECF 101.  The Court has reviewed each of these filings and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons explained below, each of the motions will be GRANTED in part and DENIED in part.

## I.      FACTUAL BACKGROUND

Plaintiffs are housing providers with residential rental properties in Baltimore City, Howard County, and Salisbury, Maryland.  ECF 97-1 at 1; ECF 98-1 at 1.  In May and June of 2020, each of the defendant jurisdictions passed legislation precluding any housing provider from increasing a renewing tenant's rent or charging late fees during the Governor's declared state of emergency related to COVID-19.  ECF 97-1 at 1; ECF 98-1 at 1.  The Acts also prohibit housing providers from notifying tenants of a forthcoming rent increase during the state of emergency or within 90 days (the Baltimore City and City of Salisbury Acts) or three months (Howard County's Act) after the state of emergency ends.  ECF 97-1 at 2; ECF 98-1 at 3.  Moreover, where tenants had previously agreed to a rent increase that would have become effective on or after March 5, 2020 (the date the Governor declared a state of emergency), the Acts required housing providers to notify the tenants in writing to disregard the fee increases to which they had previously agreed— whether or not the tenants' new lease terms had already begun.  *See* ECF 97-1 at 5 (Baltimore City); ECF 97-1 at 8 (Howard County); ECF 98-1 at 3-4 (City of Salisbury).

---

and Howard County's laws remain in force.  ECF 98-1 at 1.  However, as explained below, the Court's analysis does not differ with respect to the various plaintiffs or defendants and the rescission of the law does not impact the outcome.  Accordingly, the Court does not separately address the City of Salisbury's cross-motion.

The parties have filed cross-motions for summary judgment as to liability only.  ECF 97-1 at 2 n.3.  Accordingly, for that limited purpose, Defendants have agreed to accept the factual allegations in the Amended Complaint as true.  ECF 91-1 at 3 n.1.

## II.   LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  *Id.* at 352.  The non-moving party "must produce competent evidence on each element of [its] claim."  *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine

issue as to any material fact," because the failure to prove an essential element of the case

"necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 Fed. App'x 459, 461 (4th Cir. 2010)

(unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts,

including reasonable inferences to be drawn from them, "in the light most favorable to the party

opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88

(1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   ANALYSIS

### A.   Counts 1 and 2: Takings Claims[2]

The Takings Clause of the Fifth Amendment to the United States Constitution prohibits

the government from taking "private property . . . for public use, without just compensation." U.S.

Const., Amend. V. The Maryland Constitution contains an analogous provision that Maryland

courts apply to laws passed by local governments. Maryland Const., Art. III, Sec. 40; *Litz v.*

*Maryland Dep't of Environment*, 446 Md. 254, 265-66 (2016); *see Dabbs v. Anne Arundel County*,

458 Md. 331, 348 (2018). "[T]he Fifth and Fourteenth Amendments to the United States

Constitution and Article III, § 40, of the Maryland Constitution have the same meaning and effect,

and 'it is well established that the decisions of the Supreme Court are practically direct authorities'

for both provisions." *Neifert v. Dep't of the Env't*, 395 Md. 486, 516 n.33 (2006) (quoting

*Maryland Green Party v. Maryland Bd. of Elections*, 377 Md. 127, 166 (2003)) (internal quotation

omitted); *Bureau of Mines v. George's Creek*, 272 Md. 143, 156 (1974); *Chae Bros., LLC v. Mayor*

---

[2] Count 1 alleges a violation of the Takings Clause of the United States Constitution and Count 2 alleges a violation of the Takings Clause of the Maryland Constitution. ECF 72. As explained above, the two clauses are interpreted similarly. To the extent the Maryland Constitution and its Declaration of Rights extend broader protections with respect to the abrogation of vested property rights, those protections are addressed, *infra*, as part of the Court's analysis of Count 3.

*& City Council of Baltimore*, No. GLR-17-1657, 2018 WL 1583468, at *9 (D. Md. Mar. 30, 2018)

("Maryland courts generally interpret Article III, § 40 of the Maryland Constitution in <u>pari materia</u>

with the Takings Clause of the Fifth Amendment.") (emphasis in original).

The Supreme Court has recognized two kinds of takings: physical takings and regulatory takings. *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 364 (4th Cir. 2020). Physical takings are effected when the government physically invades or appropriates property. *United States v. Pewee Coal Co.*, 341 U.S. 114, 115 (1951). Regulatory takings, on the other hand, fall into two categories—*per se* (or categorical) takings and takings subject to the *ad-hoc* multi-factor balancing test announced in the Supreme Court's landmark decision in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978). The Supreme Court has identified two kinds of *per se* regulatory takings: those that deprive an owner of "*all* economically beneficial uses" of property, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original), and those that are akin to physical takings where the regulation requires an owner to suffer a "permanent physical occupation" of the subject property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). Any regulation that falls outside of those two narrow categories is subject to the balancing test set forth in *Penn Central* to determine whether the regulation "goes too far," such that it effects a taking for which just compensation is required. *Penn Central*, 260 U.S. at 415.

Here, Plaintiffs ask this Court to find that the Acts effect a *Loretto*-type *per se* taking with respect to rent obligations that existed before the Acts were enacted, and a *Penn Central*-type taking with respect to the Acts' prospective applications. ECF 97-1 at 22.

###### i. The Acts Do Not Effect a *Per Se* Regulatory Taking Akin to Physical Appropriation of Property

Plaintiffs argue that "as to rent obligations that existed before the Acts were enacted, the Acts effect a *Loretto*-type *per se* regulatory taking because they transfer back to the tenant property that the tenant contractually-owes to the housing provider—namely, the agreed-upon, increased rent amount."  ECF 97-1 at 22-23.  The *Loretto* case involved a New York statute that required landlords to permit a cable television company to put certain installations on their properties. *Loretto*, 458 U.S. at 421.  The Supreme Court held that the law constituted a taking "without regard to the public interests that it may serve" because it authorized a "permanent physical occupation" of the landlords' properties.  *Id.* at 426.

Plaintiffs, here, do not argue (nor could they) that the Acts, in any literal sense, authorize a "permanent physical occupation" of any property.  Instead, they argue that the Acts' effect of abrogating their contractual rights to receive increased rental payments is like the kind of physical appropriation of property described in *Loretto*.  The Supreme Court simply has not extended *Loretto* this far.

Plaintiffs rely on *Brown v. Legal Foundation of Washington*.  538 U.S. 216 (2003).  In *Brown*, the appellants challenged a Washington State Supreme Court rule requiring "Limited Practice Officers" (non-lawyers licensed to act as escrowees in real estate closings) to deposit client funds in interest-bearing "interest on lawyers' trust accounts" ("IOLTA") so that the funds could generate interest to be used for charitable legal services provided by the State.  *Id.* at 227-28.  Appellants argued that the rule effected a taking for which just compensation was owed because the State was appropriating the interest generated in the IOLTA accounts.  *Id.* at 228-29. In a predecessor case, the Supreme Court had held that such interest "is the private property of the owner of the principal [*i.e.* the client]."  *Phillips v. Washington Legal Foundation*, 524 U.S. 156,

172 (1998).  The *Brown* Court held that *Loretto*, rather than *Penn Central*, provided the proper framework under which to analyze whether the transfer of interest constituted a taking.  *Brown*, 538 U.S. at 235 ("[T]he transfer of the interest to the Foundation here seems more akin to the small occupation of a small amount of rooftop space in *Loretto*[.]").[3]  Plaintiffs argue that here, just as in *Brown*, the Acts "appropriate discrete, identifiable property contractually-owed to the housing provider and transfer it back to the tenant in the form of a reduction in the monthly amount obligated to the housing provider."  ECF 97-1 at 23.

In *Brown*, however, the rule at issue had the consequence of appropriating physical, tangible, property—it required the appellants' money to be taken from the IOLTA accounts in which it was held and transferred to the Legal Foundation of Washington.  Here, by contrast, the Acts effectively abrogated the Plaintiffs' contractual right to the future receipt of money from their tenants.  While there is no question that the Plaintiffs had a property interest in that contractual right, *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 19 n. 16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."), the fact that no physical property was taken or occupied in this case (as it was in *Brown*) is, under the Supreme Court's precedents, a constitutionally significant difference.[4] The crux of the *Loretto* decision was that the regulation at issue effected a taking because it

---

[3] Ultimately, though, the Supreme Court found that no Fifth Amendment violation had occurred because the appellants had not suffered any compensable financial loss and, therefore, no just compensation was required. *Id.* at 240.

[4] This case might be more like *Brown* if the Acts had required the Plaintiffs to return money that tenants had already paid to them.  But there is nothing in the record here to suggest that occurred, and the parties seem to agree that it did not. *See* ECF 91-1 at 4 ("The Acts do not prohibit landlords from keeping increased rents they collected prior to enactment[.]"); ECF 99 at 5-6; ECF 100 at 4; ECF 101 at 6-7.

authorized the occupation of physical, tangible, property.  The *Brown* decision was in line with that holding, but the undisputed facts in this case are not.

### ii.   The Acts Do Not Effect a Regulatory Taking Under the *Penn Central* Balancing Test

Thus, this Court applies the test the Supreme Court announced in  *Penn Central.* To decide whether a government regulation effects a regulatory taking, courts must assess: (1) the economic impact of the regulation on the plaintiff; (2) the degree to which the regulation interferes with the plaintiff's investment-backed expectations; and (3) the character of the governmental action.  *Penn Central*, 438 U.S. at 124.  This Court will address those factors in turn but must first consider Plaintiffs' threshold argument that the Acts are unconstitutionally confiscatory.

### 1.   The Acts Are Not Unconstitutionally Confiscatory

While not part of the traditional *Penn Central* balancing test, Plaintiffs argue, as a threshold matter, that the Acts create rent control schemes that are unconstitutionally confiscatory.  ECF 97-1 at 24-26.  Plaintiffs cite a series of ratemaking and rent control cases, which stand for the proposition that while governments have the power to regulate rates (including rents), "the Takings Clause prohibits them from implementing price control schemes that result in confiscatory rates." *Id.* (collecting cases).  These cases recognize that "rent control scheme[s] must guarantee the regulated entities a just and reasonable rate of return on their investments."  *Richardson v. City and Cnty. of Honolulu*, 802 F. Supp. 326, 334 (9th Cir. 1992) (citing *Pennell v. City of San Jose*, 485 U.S. 1, 13 (1988)).  Several courts have also held that rent control schemes must offer housing providers a "meaningful mechanism for obtaining relief when the lease rent formula results in a confiscatory rate." *Id.* at 336-37; *see also* ECF 97-1 at 25-26 (collecting cases).

Plaintiffs argue that "[t]o prove their facial takings claim, all they need to show is that the Acts lack a 'safety valve' that can provide them with relief when they need it."  ECF 97-1 at 27.

The Court disagrees with that characterization of the Plaintiffs' burden here.  Even assuming the Acts create a "rent control" scheme (which the parties dispute), and even under the most generous interpretation of the cases on which Plaintiffs rely, a "safety valve" is only required "*when the lease rent formula results in a confiscatory rate.*"  *Richardson*, 802 F. Supp. at 334 (emphasis added).  Here, the Acts do not create a "lease rent formula," and, even if they did, the Plaintiffs have not demonstrated that the Acts are so harsh they rise to the level of being confiscatory.  *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307-08 (1989) (describing a confiscatory rate as one that is "so unjust as to destroy the value of the property for all the purposes for which it was acquired, and in so doing practically deprives the owner of property without due process of law[.]") (alterations omitted) (quoting *Covington & Lexington Turnpike Road Co. v. Sandford*, 164 U.S. 578, 597 (1896)).

Plaintiffs focus on the Acts' deprivation of their contractual right to increase tenants' rent obligations and argue that the Acts entirely abrogate (*i.e.* confiscate) that right.  But for purposes of a takings analysis, the Plaintiffs' lens is too narrow.  The question is not simply whether the Acts deprive the Plaintiffs of a property right.  (If takings claims were analyzed that way, every regulation that deprived property owners of a right would constitute a taking.)  Rather, the Court must view the specific property interest of which Plaintiffs have been deprived in the context of Plaintiffs' remaining interests in their properties and, here, their remaining contractual rights to receive rent from their tenants.  *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 496-97 (1987) (rejecting the petitioners' attempt to "narrowly define certain segments of their property and assert that, when so defined, the [Act] denies them economically viable use[]" and, instead, "compar[ing] the value that has been taken from the property with the value that remains in the property[.]").

The Acts allow the Plaintiffs to continue collecting rent, and—distinct from any of the rent control cases on which Plaintiffs rely—they place no restrictions on what the Plaintiffs can charge new tenants because the Acts only apply to "existing tenants during an emergency[.]"  ECF 72-1 at 2 (Baltimore City Act).  Thus, while the Acts undoubtedly place a severe economic burden on the Plaintiffs, the Plaintiffs have not met their extremely high bar to show that the Acts are confiscatory.  For the same reasons, the Court cannot conclude on the facts before it that the Acts deprive Plaintiffs of a "reasonable rate of return on their investments."

### 2.  Economic Impact

Turning to the traditional *Penn Central* factors, Plaintiffs argue that the economic impact of the Acts is severe because they "rely on anticipated rent increases to pay and budget for a multitude of expenses to keep their businesses afloat and their tenants safe[.]"  ECF 97-1 at 26.  That economic impact, Plaintiffs argue, is made more severe by the Acts' lack of any "mechanism for Plaintiffs, or any housing provider, to seek relief from their generally-applicable strictures."  *Id.*  Further, because the Acts have no defined end date (and, instead, effectively sunset 90 days or three months after the rescission of the Governor's state of emergency), Plaintiffs argue that the economic impacts of the Acts will burden them for years into the future.  *Id.* at 28.

The Court agrees with the Plaintiffs' characterizations of the severe economic burdens of the Acts.  The Acts treat all private rental housing providers the same—no matter their costs and no matter their tenants' financial circumstances—and offer them no way to seek individualized relief.  While the Court does not doubt the Defendants' motivations to assist tenants with their fundamentally important housing obligations in the wake of a financial crisis spawned by a global pandemic, the Plaintiffs have been forced to weather the pandemic and the resulting financial crisis, too.  For them, these Acts have worsened, rather than alleviated, the pandemic's financial

10

impacts.  Fair or not, Defendants have made a policy choice "that housing providers (regardless of circumstance) should shoulder a disproportionate financial burden simply because they are housing providers[.]"  ECF 97-1 at 41.

Nonetheless, the Plaintiffs have not shown the kind of drastic economic impact that is required to demonstrate a regulatory taking under the *Penn Central* test.  It is axiomatic that "[a] regulation is not a taking merely because it 'prohibits the most beneficial use of the property[.]'" *Quinn v. Board of Cnty. Comm'rs*, 862 F.3d 433, 442 (4th Cir. 2017) (alteration omitted) (quoting *Penn Central*, 438 U.S. at 125); *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) ("mere diminution in the value of property, however serious, is insufficient to demonstrate a taking."); *see Andrus v. Allard*, 444 U.S. 51, 65-66 (1979) (property owners "possess a full bundle of property rights, [and] the destruction of one strand of the bundle is not a taking.").  The Fourth Circuit has found that "a hypothetical 83 percent diminution in value was insufficient to establish a regulatory taking" and noted its sister circuits' findings that no regulatory taking occurred "when presented with diminutions in value of 75 percent and 92.5 percent."  *Clayland Farm Enters., LLC v. Talbot Cnty.*, 987 F.3d 346, 354 (4th Cir. 2021) (first citing *Pulte Home Corp. v. Montgomery Cnty.*, 909 F.3d 685, 696 (4th Cir. 2018) then citing *Henry v. Jefferson Cnty. Comm'n*, 637 F.3d 269, 277 (4th Cir. 2011) (citing *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 456 & n.6 (6th Cir. 2009); *Iowa Coal Mining Co. v. Monroe Cnty.*, 257 F.3d 846, 853 (8th Cir. 2001))).  While the Plaintiffs put forth evidence of the economic effects of the Acts, ECF 72-4-24 (Plaintiffs' declarations), they have not demonstrated the kind of complete economic destruction of their property interests that is required to prove a regulatory taking.  This factor, therefore, weighs significantly in favor of the Defendants.

### 3.   Investment-Backed Expectations

The second factor of the *Penn Central* test assesses the regulated entities' "investment-backed expectations." *Penn Central*, 438 U.S. at 124.  This inquiry is informed by "the existing use of property," *Nat'l Advertising Co. v. City of Raleigh*, 947 F.2d 1158, 1162 (4th Cir. 1991) (quotation omitted), and the "law in force in the State in which the property is located" at the time of the challenged government action.  *Ark. Fish & Game Comm'n v. United States*, 568 U.S. 23, 38 (2012).  The parties disagree about whether the Plaintiffs reasonably could have expected government regulations to interfere with their ability to increase rents and collect late fees.  On the one hand, the Plaintiffs argue that they could not possibly have foreseen the COVID-19 pandemic and the resultant government regulation issued to mediate its financial and public health impacts. ECF 97-1 at 28-29.  On the other hand, Defendants argue that the landlord-tenant relationship is highly regulated.  ECF 91 at 9-10.

Courts have split along similar lines. Some have found that "the business area of renting residential property is heavily-regulated" and, therefore, landlords could have expected regulations that would interfere with their ability to raise rents and collect fees.  *Southern Cal. Rental Housing Ass'n v. County of San Diego*, No. 3:21-cv-912-L-DEB, 2021 WL 3171919, at *9 (S.D. Cal. July 26, 2021) (citing *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 171-72 (S.D.N.Y. 2020); *Auracle Homes LLC v. Lamont*, 478 F. Supp. 3d 199, 199, 222-23 (D. Conn. 2020)). Others, by contrast, have found that "although landlords understood they were operating in a highly regulated arena, they could not have expected the COVID-19 pandemic and its attendant regulations."  *Id.* (citing *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 390 (D. Mass. 2020); *Heights Apts., LLC v. Walz*, 510 F. Supp. 3d 789, 813 (D. Minn. 2020)); *Apartment Ass'n of Los Angeles*

12

*Cnty., Inc. v. Los Angeles*, 500 F. Supp. 3d 1088, 1096 (C.D. Cal. 2020) ("[N]o amount of prior

regulation could have led landlords to expect anything like the blanket [eviction] moratorium.").

The landlord-tenant relationship undoubtedly involves significant regulation.  But housing

providers are not generally subject to blanket, exception-free restrictions on their ability to raise

rents or collect late fees.  *See Apartment Ass'n of Los Angeles Cnty.*, 500 F. Supp. 3d at 1096.

And, even crediting the Defendants' argument that these Acts are protective measures designed to

facilitate social distancing, landlords certainly could not have expected that their ability to set rent

would be impacted by the public's need to limit in-person interactions to reduce the spread of a

deadly virus.[5]  Accordingly, the Court finds that this factor weighs slightly in favor of the

Plaintiffs.

### 4.   Character of the Government Action

The character of the government action here also weighs strongly in favor of the

Defendants.  The Supreme Court's precedents require substantial deference to government actions

taken to protect the public.  As the Supreme Court has found, a regulation which "arises from a

public program that adjusts the benefits and burdens of economic life to promote the common

good . . . does not constitute a taking requiring Government compensation."  *Connolly v. Pension*

---

[5] The Court does not question the validity of this argument insofar as it was an initial justification
for the Acts.  There is no doubt that stable housing helps to facilitate social distancing, and that
one strategy to mitigate the spread of COVID-19 was (and remains) to limit the population of
people without housing.  *See* Nature, *Coronavirus Is Spreading Under the Radar in US Homeless
Shelters* (May, 7, 2020), https://www.nature.com/articles/d41586-020-01389-3 ("Close living
quarters and a lack of testing among homeless people across the United States threaten the nation's
ability to control the pandemic, researchers say.").  However, nearly a year and a half later,
Defendants have relaxed many non-housing related regulations that were initially put in place to
facilitate social distancing and prevent the spread of the virus.  While the Court is in no position
to evaluate those policy choices from a public health perspective, they make it hard for the Court
to give much weight to the Defendants' argument that there is a continuing public health need to
preclude *all* private rental housing providers from raising rents and collecting late fees.

*Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986) (citing *Penn Central*, 438 U.S. at 124).  Moreover, while not dispositive, it is also significant that the nature of the Acts here are "uncharacteristic of a regulatory taking."  *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006).  In *Buffalo Teachers*—a case upholding a wage freeze on teacher salaries against a takings challenge—the court explained, "[n]othing is affirmatively taken by the government.  Instead, the government annuls something—namely, the appellants' contractual right to a wage increase." *Id.* The same is true here.

*                              *                              *

For the foregoing reasons, the Plaintiffs cannot demonstrate that the Acts effect a taking that requires government compensation.  Accordingly, the Plaintiffs' Cross-Motions are denied with respect to Counts 1 and 2, and the Defendants' Motion is granted.

### B.  Count 3: Vested Property Rights

Under a long line of cases, the Maryland Court of Appeals has established that, "[t]ogether, Maryland's Declaration of Rights and Constitution prohibit the retrospective reach of statutes that would have the effect of abrogating vested rights."  *Muskin v. State Dept. of Assessments and Taxation*, 422 Md. 544, 555 (2011).  Generally, the Maryland Constitution and its Declaration of Rights are interpreted as coextensive with their federal counterparts.  *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 621 (2002); *Muskin*, 422 Md. at 556.  The protection against laws that abrogate vested rights, however, is one area in which the two constitutional frameworks differ.  *Muskin*, 422 Md. at 556.  Indeed, the Maryland Court of Appeals has been explicitly clear that, with respect to the abrogation of vested rights, Maryland law "impose[s] greater limitations (or extend[s] greater protections) than those prescribed by the United States Constitution's analog provisions."  *Id.*; *Dua*, 370 Md. at 621.

Thus, as the Court of Appeals has explained, "[i]t has been firmly settled . . . that the Constitution of Maryland prohibits legislation which retroactively abrogates vested rights." *Dua*, 370 Md. at 623.  This prohibition contains no exceptions, and the Court of Appeals has repeatedly held that this protection applies without regard to the State's legislative interests or motivations. "No matter how 'rational' under particular circumstances, the State is constitutionally precluded from abolishing a vested property right or taking one person's property and giving it to someone else.  The state constitutional standard for determining the validity of retroactive civil legislation is whether vested rights are impaired and *not* whether the statute has a rational basis." *Id.* (emphasis in original); *Muskin*, 422 Md. at 557 ("If a retrospectively-applied statute is found to abrogate vested rights or takes property without just compensation, it is irrelevant whether the reason for enacting the statute, its goals, or its regulatory scheme is 'rational.'").

Applying this test, here, this Court must first determine whether the Acts operate retrospectively, and then, if they do, whether they abrogate the Plaintiffs' vested rights.

### i. Retrospective Application

"Retrospective statutes are those 'acts which operate on transactions which have occurred or rights and obligations which existed before the passage of the act.'" *Muskin*, 422 Md. at 557 (quoting *Langston v. Riffe*, 359 Md. 396, 406 (2000)).  In *John Deere Const. & Forestry Co. v. Reliable Tractor, Inc.*, the Maryland Court of Appeals explained that retrospective statutes are those that "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  406 Md. 139, 147 (2008).  In *John Deere*, the Court of Appeals also adopted the factors set forth in the United States Supreme Court's decision in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994), to assess whether a statute operates retroactively.  *John Deere*, 406 Md. at 147-48.  Those factors

assess "fair notice, reasonable reliance, and settled expectations" to evaluate "the nature and extent of the change in law and the degree of connection between the operation of the new rule and a relevant past event." *Landgraf*, 511 U.S. at 270.

Plaintiffs, here, argue that the Acts apply retroactively because, "[b]y their plain terms, they undo all previously settled, agreed-upon (*i.e.* vested) rent increases that took effect or would have taken effect after March 5, 2020.  They even require housing providers to direct tenants to disregard rent obligations that existed before the Acts were passed."  ECF 97-1 at 36.  The Defendants, on the other hand, argue that the Acts apply prospectively because they do not "impose new duties" on the Plaintiffs or increase their "liability for past conduct."[6]  ECF 91-1 at 14. According to Defendants, "[e]ven though the tenant may have agreed to an increased rental rate or agreed to a lease containing an automatic renewal clause, the Acts' restrictions apply to the tenant's continuing obligation to make monthly rental payments."  ECF 91-1 at 15.

Insofar as the Acts alter contractual obligations that existed prior to their enactment, they operate retroactively under any of the metrics the Court of Appeals uses to assess a law's retroactivity.  Under the considerations set forth in *John Deere*, the Acts "impose new duties with respect to transactions already completed" because they require housing providers to accept rental payments that are less than the rental payments their tenants were contractually obligated to pay before the Acts' passage.  *John Deere*, 406 Md. at 147.  Defendants suggest that such a change to the parties' existing contractual obligations was not retroactive because it only prospectively altered the amount owed by the tenant (*i.e.* the tenant only began paying the lower rent amount

---

[6] Notwithstanding the Defendants' arguments, it bears noting that Baltimore City itself describes its Act as applying "retroactively from March 5, 2020."  ECF 97-1 at 35 (citing Baltimore City Code, Art. 13, § 8-4 editor's note).

*after* the Acts went into effect).  ECF 91-1 at 15.  That may be true, but it does not change the fact that the Acts achieve such a result by altering *pre-existing* contractual obligations.

The Acts are retroactive under the *Landgraf* factors, too.  The Acts did not provide fair notice because there was no time between the Acts' enactment and their effective dates (indeed, their effective dates were *before* their enactment dates).  *Cf. Muskin*, 422 Md. at 558 ("[F]air notice is satisfied by the reasonable time period between enactment of Chapter 290 in 2007 and the registration deadline of 30 September 2010.").  The Acts also upset Plaintiffs' reasonable reliance interests because Plaintiffs "rely reasonably on the future income from" leases to which their tenants have already agreed.  *Id.* ("Ground rent owners rely reasonably on future income from ground rents[.]").  For the same reason, the Acts altered the Plaintiffs' settled expectations because, before the Acts were enacted, the Plaintiffs had no reason to believe that their interests in receiving rental income pursuant to existing contractual obligations was "anything but well-settled."  *Id.*

Finally, the Court of Appeals' decision in *Muskin* is instructive on the issue of retroactivity. There, the Court of Appeals analyzed a law that extinguished a ground rent owner's interest in the ground rent if the owner failed to register the ground rent on a statewide database by a certain deadline.  *Id.* at 549-50.  The law provided more than two years after its enactment for ground rent owners to comply with the law's registration requirements.  *Id.* at 551-52.  If they did not, only then did the law purport to extinguish their ground rent ownership and, correspondingly, their right to receive future ground rent payments from their lessees.  *Id.*  Nonetheless, the Court of Appeals found that the law operated retroactively because "upon failure to register timely, the [state] is required to reach back in time and divest the reversionary interest of the ground rent owner and cancel his/her/its right to receive future ground rent from the leaseholder."  *Id.* at 559.  So too here; the Acts "reach back in time" and adjust the amount of rent that the tenant is obligated to pay the

Plaintiffs for the duration of their lease term.  And unlike the law in *Muskin*—which gave notice and more than two years to comply with the law's requirements—the Acts here were retroactively effective and immediately impacted the parties' settled contractual obligations.  If, as the Court of Appeals found, the law in *Muskin* operated retrospectively, there can be no question that these Acts did also.

Accordingly, insofar as the Acts upset rent obligations to which tenants had agreed prior to their enactment, the Acts operated retrospectively.

### ii.  Vested Rights

"A vested right is 'something more than a mere expectation based on the anticipated continuance of the existing law; it must have become a title, legal or equitable, to the present or future enjoyment of a property[.]" *Id.* at 560 (emphasis omitted) (quoting *Allstate Ins. Co. v. Kim*, 376 Md. 276, 298 (2003)).  The Maryland Court of Appeals has held that the contractual right to receive future rental income under a lease is a vested right.  *Id.*  As the Court of Appeals explained in *Muskin*, for example, "[t]here can be no reasonable doubt that the reversionary interest to real property and the contractual right to receive ground rent are vested rights under Maryland law." *Id.* at 560.

Here, Plaintiffs argue that the Acts abrogate their vested rights because "rent obligations that were mutually agreed-upon before the Acts were passed are rendered unlawful[.]"  ECF 97-1 at 33.  Defendants counter that "[w]hile Plaintiffs[] may have an expectation of higher rental payments, this is not, in and of itself, a vested interest."  ECF 91-1 at 12.  They continue that "Plaintiffs do not secure 'vested' rights before the expiration of the current lease term, before the inception of the new tenancy, and before any new increased rental payment is due or paid by the tenant."  *Id.* at 12-13.

18

The Defendants are correct that a mere "expectation of higher rental payments" is not necessarily a vested right.  However, with respect to rent obligations that were agreed to before the Acts' enactments, the Plaintiffs' interest was not merely an "expectation" but rather a contractual entitlement.  And, under Maryland law, Plaintiffs had a vested right in that contractual obligation even if the tenant's current lease term had not yet expired, even if the new tenancy had not yet begun, and even if the new rental obligations were not yet due or paid by the tenant. *Muskin*, 422 Md. at 560.

Defendants also try to distinguish *Muskin* by arguing that "the Acts here do not require Plaintiffs to forfeit their entire leasehold interest . . . . And, unlike the legislation in *Muskin*, the Acts are temporary."  ECF 100 at 12.  But nothing in *Muskin* depended on the fact that the ground rent owner's *entire* leasehold interest, rather than only part of it, would be subject to extinction—all that mattered was that the owners had a vested right that was abrogated by the legislation at issue.  Similarly, the fact that the Acts are temporary does not change the fact that the Acts abrogated Plaintiffs' contractual right to receive rental payments at a previously agreed upon amount.  In other words, the fact that Plaintiffs may, at some point in the future, be allowed to increase their rents again has no bearing on the fact that the Acts abrogated their rights to receive rental income at amounts that had been agreed to before the Acts were enacted.

Accordingly, as to leases that became effective at an increased rent—or where a tenant had agreed to begin a new lease at an increased rent—before the Acts were enacted, the Acts abrogated the Plaintiffs' vested rights to receive the difference between the amount the tenant had agreed to pay and the amount the Acts required the Plaintiffs to accept instead.  Therefore, the Plaintiffs' Cross-Motions will be granted, and the Defendants' Motion denied, as to Count 3.

### C.  Counts 4 and 5: Due Process Claims[7]

Plaintiffs argue that the Acts violate their substantive due process rights.  To prevail, Plaintiffs would need to establish: "(1) that [they] possessed a 'cognizable property interest, rooted in state law,' and (2) that the [Defendants] deprived [them] of this property interest in a manner 'so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency[.]'"  *Siena Corp. v. Mayor and City Council of Rockville Maryland*, 873 F.3d 456, 461 (4th Cir. 2017) (first quoting *L.M. Everhart Constr., Inc. v. Jefferson Cnty. Planning Comm'n*, 2 F.3d 48, 51 (4th Cir. 1993) then quoting *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 827 (4th Cir. 1995)).  Plaintiffs would, therefore, need to show that the Acts "lack any 'conceivable rational relationship to the exercise of the state's traditional police power.'"  *Id.* at 464 (quoting *Sylvia Dev. Corp.*, 48 F.3d at 827).  Plaintiffs cannot meet that burden.

Regardless, as a threshold matter, Plaintiffs do not point to a property interest that is distinct from the interests at issue in their other claims.  That alone precludes their substantive due process claim.  *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of governmental behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (internal quotations omitted).  "Claims of constitutional violations cannot be aggregated and re-packaged into a separate substantive due process claim."  *Heights Apts.*, 510 F. Supp. 3d at 815.  Plaintiffs

---

[7] Count 4 alleges a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Count 5 alleges a violation of Article 24 of the Maryland Declaration of Rights.  ECF 72.  The parties agree that, "Courts generally interpret Article 24 of the Maryland Declaration of Rights in pari materia" with the Due Process Clause of the Fourteenth Amendment, *Chae Bros., LLC*, 2018 WL 1583468, at *9 (emphasis in original), and that, to the extent "Maryland state law provides greater protections under its Due Process Clause, those additional protections are reflected in Plaintiffs' vested rights claim (Count 3))."  ECF 97-1 at 37 n.32.

have alleged plausible—though ultimately unsuccessful—claims that the Acts violate their federal constitutional rights under the Takings Clause of the Fifth Amendment, the Contracts Clause, and the Equal Protection Clause of the Fourteenth Amendment. Accordingly, their attempt to use the Due Process Clause to duplicate those claims must fail.

Regardless, even assuming for the sake of argument that Plaintiffs could show that the Acts deprived them of a cognizable property interest, they cannot meet their burden to establish that the Acts lack any "conceivable rational relationship to the exercise of the state's traditional police power." *Siena Corp.*, 873 F.3d at 827. To be sure, the Plaintiffs persuasively argue that the Acts are overbroad, burdensome, and poorly tailored to the goals they are meant to achieve. But those arguments cannot outweigh the unquestionably legitimate goals the Acts are meant to advance (protecting Marylanders from COVID-19's economic and public health consequences), and the logical relationship between the Acts' prohibitions and those goals. Simply put, the fact that the Defendants could have legislated with more precision does not amount to a Due Process violation. *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 685 (2012) (on rational basis review, "the Constitution does not require the City to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line.").

Accordingly, Defendants' Motion is granted with respect to Counts 4 and 5, and Plaintiffs' Cross-Motions are denied as to those counts.

### D.  Counts 6 and 7: Equal Protection Clause Claims[8]

The parties appear to agree that the Plaintiffs' status as "housing providers" subjects their equal protection claims to rational basis review.  ECF 91-1 at 20-21; ECF 97-1 at 40.  As explained above, the Acts easily clear that low bar.

First, Plaintiffs argue that "the classification drawn by the Acts is irrelevant to the stated objective[,]" because the "Acts do not draw a classification based on financial hardship."  ECF 97-1 at 41.  But the fact that the law does not draw any classification along financial lines among housing providers, or their tenants, does not mean that the prohibition on raising rents and collecting late fees is "irrelevant" to the Acts' goal of assisting tenants during a financial crisis.  Plaintiffs essentially argue that the Acts are overbroad and unfair because they are not more narrowly tailored to the goal of protecting financially vulnerable tenants.  They may be right, but that is not enough to establish that the Acts have no conceivable rational relationship to the Defendants' goals.  *See Armour*, 566 U.S. at 685.

Second, Plaintiffs argue that the Acts must fail rational basis review because Defendants "cannot continue to claim that the Acts are necessary to promote 'social distancing' and 'sheltering in place.'"  ECF 97-1 at 41.  They base this argument on the fact that "Defendants and the state have jettisoned mask mandates, capacity restrictions on businesses, and other measures related to 'social distancing' and 'sheltering in place.'"  *Id.*  At best, the Plaintiffs argue that the Defendants have acted inconsistently across different industries with respect to their goals of promoting social

---

[8] Count 6 alleges a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Count 7 alleges a violation of Article 24 of the Maryland Declaration of Rights.  ECF 72.  "Although the Maryland Constitution contains no express equal protection clause, it is settled that the Due Process Clause of the Maryland Constitution, contained in Article 24 of the Declaration of Rights, embodies the concept of equal protection of the laws to the same extent as the Equal Protection Clause of the Fourteenth Amendment."  *Murphy v. Edmonds*, 325 Md. 342, 353 (1992).

distancing and sheltering in place.  Again, though, that does not mean that the Acts have no conceivable rational relationship to the goal of reducing the spread of COVID-19.

Therefore, Defendants' Motion will be granted as to Counts 6 and 7, and the Plaintiffs' Cross-Motions on those counts will be denied.

### E.  Count 8: Contracts Clause

Article I, Section 10 of the United States Constitution prohibits states from passing any law "impairing the Obligation of Contracts."  U.S. Const., Art. I, Sec. 10.  While the Contracts Clause appears absolute, the Supreme Court has made clear that it "is not the Draconian provision that its words might seem to imply." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978). "To determine when such a law crosses the constitutional line, this Court has long applied a two-step test.  The threshold issue is whether the state law has 'operated as a substantial impairment of a contractual relationship.'" *Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018) (quoting *Allied Structural Steel*, 438 U.S. at 244).  If the court finds a substantial impairment, "the inquiry turns to the means and ends of the legislation.  In particular, the Court has asked whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983)).

#### i.  Substantial Impairment

To analyze whether a law substantially impairs a contractual relationship, courts must consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822.  Plaintiffs argue that the Acts create a substantial impairment because, "[f]or rent increases that were agreed to before the Acts were enacted, the Acts undo the settled rent obligation for the

new lease term (but not the housing provider's corresponding contractual obligations to the tenant for the new lease term) and reinstate the base rent amount from the tenant's expired lease term." ECF 97-1 at 42.

With respect to contractual obligations that existed before the Acts' enactments, the Acts clearly undermine the contractual bargain. The rent obligation to which the parties agreed under a lease agreement is unquestionably a material term. And the Acts effectively reduce that rent obligation to the amount under the tenant's previous lease term. Because the contracts were premised on the increased rent amount, the Acts materially undermine the parties' bargain.

The Acts also interfere with the parties' reasonable expectations. Like the "investment-backed expectations" prong of the takings analysis under *Penn Central*, *supra*, "[i]n this inquiry, it is especially important whether the parties operated in a regulated industry." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 190 (1st Cir. 1999) (citing *Energy Reserves Group*, 459 U.S. at 413). As explained above, the landlord-tenant relationship is heavily regulated, but private rental housing providers do not reasonably expect to be prohibited—completely and with no exceptions—from increasing their tenants' rent obligations from year to year.

Finally, the Acts prevent Plaintiffs from "safeguarding or reinstating" their rights. *Sveen*, 138 S. Ct. at 1822. The Acts contain no exceptions, nor do they create any mechanisms through which Plaintiffs can seek individualized relief. Simply put, the Acts do not create any way for private rental housing providers to avoid the Acts' requirements. *Cf. id.* at 1823 (describing how individuals could avoid a default rule created by the Minnesota law at issue that revoked former spouses' beneficiary rights under insurance policies). While the Acts are temporary, nearly a year and a half later, it remains unclear when they will end.[9]

---

[9] Except for the City of Salisbury's act, which has been rescinded. ECF 92.

Thus, the Court finds that the Acts substantially impair the Plaintiffs' contracts with tenants who had already agreed to rent increases before the Acts were enacted.

### ii.   Reasonableness and Public Purpose

When its actions impair a contract, "the State, in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem[.]"  *Energy Reserves Group*, 459 U.S. at 411-12 (internal citations omitted).   To pass constitutional muster, the government action must "appropriate[ly]" and "reasonabl[y]" further "a significant and legitimate public purpose."  *Id.*  The purpose of this analysis is to ensure that "the State is exercising its police power, rather than providing a benefit to special interests."  *Id.* The Supreme Court has described the police power, in the context of the Contracts Clause, as, "an exercise of the sovereign right of the Government to protect the lives, health, morals, comforts, and general welfare of the people[.]"  *Manigault v. Springs*, 199 U.S. 473, 480 (1905).  That authority "extends to economic needs as well."  *Veix v. Sixth Ward Ass'n*, 310 U.S. 32, 39 (1940).

For purposes of the Contracts Clause analysis, the degree of deference afforded to the government depends on the nature of the contract its actions impair.  When the government impairs a private contract, courts "properly defer to legislative judgments as to the necessity and reasonableness of a particular measure."  *Baltimore Teachers Union, American Federation of Teachers Local 340, AFL-CIO v. Mayor and City Council of Baltimore*, 6 F.3d 1012, 1019 (4th Cir. 1993) (quoting *United States Trust*, 431 U.S. at 23).  However, a more exacting inquiry is required when the Government impairs a public contract because "the State's self-interest is at stake."  *Id.* (quoting *United States Trust*, 431 U.S. at 26).  Thus, "the law affords States a wide

berth to infringe upon private contractual rights when they do so in the public interest rather than self-interests." *Elmsford Apt. Assocs.*, 469 F. Supp. 3d at 169.

In this way, the Plaintiffs misapprehend the test under which this Court must assess the Acts' reasonableness.  They argue that, "[i]n a Contracts Clause analysis, the government 'is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.'"  ECF 97-1 at 43 (quoting *United States Trust*, 431 U.S. at 31).  But that is the standard that applies when the Government impairs a *public* contract, not where, as here, the Acts impair private contracts.  *Buffalo Teachers Federation*, 464 F.3d at 371 (describing the requirement that an act not "'impose a drastic impairment when an evident and more moderate course would serve its purposes equally well'" as part of the "less deference scrutiny" test when a court is assessing the reasonableness of an impairment of a public contract) (quoting *United States Trust*, 431 U.S. at 30-31).

Accordingly, the Court owes substantial deference to the Defendants' justifications for the Acts.  Several courts have analogized this level of deference to a rational basis inquiry.  *See Baptiste*, 490 F. Supp. 3d at 385-86 n.10; *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 55 (2d Cir. 1998) ("Tinnerello must prove that there is no rational relationship between the Town's ends and its means.  Merely contending that there was a better way, Tinnerello has not carried its burden.").  As explained above, the Acts here easily pass that test.  There is nothing in the record to suggest that the Acts were irrational or illegitimate.  And although the Plaintiffs have suggested myriad ways in which the Acts could have been tailored more precisely to achieve the Defendants' purported ends and to avoid the attendant economic consequences to all private rental housing providers, this Court is constrained to defer to the Defendants' legislative judgments,

which were unquestionably meant to further "significant and legitimate public purpose[s]." *Energy Reserves Group*, 459 U.S. at 411-12.

Therefore, the Court will grant the Defendants' Motion, and deny the Plaintiffs' Cross-Motions, on Count 8.

### F.  Count 9: Intentional Interference with Contractual or Business Relations

"A local government entity is liable for its torts if the tortious conduct occurs while the entity is acting in a private or proprietary capacity, but, unless its immunity is legislatively waived, it is immune from liability for tortious conduct committed while the entity is acting in a governmental capacity." *DiPino v. Davis*, 354 Md. 18, 47 (1999).  There can be no dispute here that Defendants were acting in a governmental capacity when they passed the Acts.  *Tadjer v. Montgomery Cnty.*, 300 Md. 539, 547 (1984) ("[E]nactment of legislation is a governmental function[.]").  Moreover, there is no indication in the Acts, or elsewhere, that the Defendants waived their immunity such that they could be held liable for common law torts related to the passage of the Acts.

Plaintiffs do not meaningfully dispute the Defendants' immunity except to argue that "Defendants offer no authority for the proposition that they have immunity for their own unconstitutional conduct or that unconstitutional legislation is ever justified."  ECF 97-1 at 45.  Plaintiffs have litigated their constitutional claims in the counts described above, but here they seek to prevail on a common law tort claim.  The Acts' constitutionality, therefore, has no bearing on whether the Defendants are liable to the Plaintiffs for the torts alleged in Count 9.  Under established Maryland law, they are not.  *See DiPino*, 354 Md. at 47.

Putting aside the Defendants' immunity, the torts alleged in Count 9—as is readily apparent from their names, and as Plaintiffs admit—hinge on the Defendants' intent.  *See* ECF 97-1 at 44

(listing elements of intentional interferences with contractual relations). Aside from the plain text of the Acts themselves, and whatever can be inferred from that text, there are no facts in the record that bear on the Defendants' intent in passing the Acts.

Accordingly, the Defendants' Motion will be granted on Count 9, and the Plaintiffs' Cross-Motions will be denied.

### G. Count 10: Preemption

Plaintiffs argue that a Maryland state law which limits the amount of late fees landlords may charge their tenants preempts any local regulation of late fees. Their argument hinges on two provisions of Maryland's Real Property laws. First, Section 8-208 of the subtitle on written lease requirements states:

> (d) A landlord may not use a lease or form of lease containing any provision that:
> . . . .
> (3)(i) Provides for a penalty for the late payment of rent in excess of 5% of the amount of rent due for the rental period for which the payment was delinquent; or
> (ii) In the case of leases under which the rent is paid in weekly rental installments, provides for a late penalty of more than $3 per week or a total of no more than $12 per month[.]

Md. Code Ann., Real Prop. § 8-208(d). According to the Plaintiffs, this provision grants housing providers an affirmative right to charge late fees subject to the limitation in Section 8-208(d) and also preempts any local regulation of late fees. *See* ECF 97-1 at 46. This Court disagrees.

A state law "may preempt [a] local law in one of three ways: (1) preemption by conflict, (2) express preemption, or (3) implied preemption." *County Council of Prince George's Cnty. v. Chaney Enters. Ltd. P'ship*, 454 Md. 514, 540-41 (2017) (quoting *Maryland Reclamation Assocs., Inc. v. Harford Cnty.*, 414 Md. 1, 36 (2010)). Plaintiffs argue that Section 8-208(d) preempts the Acts under the theories of conflict preemption and implied preemption. ECF 97-1 at 46.

"Conflict preemption occurs when a local law prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law." *Chaney Enters.*, 414 Md. at 541 n.19.  Plaintiffs argue that Section 8-208(d)'s ceiling on late fees establishes an affirmative right for landlords to charge late fees.  Defendants argue, however, that Section 8-208 "prescribes a late-fee ceiling" but that "it does not preclude local governments from establishing a lower ceiling."  ECF 91-1 at 33.  Thus, Defendants argue that Section 8-208(d) is "less an express authorization" and more of a "restriction of permitted" late fees.  *Id.* (quoting *Montgomery Cnty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 689 (Md. Ct. Spec. App. 2019), *cert. denied sub nom. Goodman v. Montgomery Cnty.*, 464 Md. 585 (2019)).  This Court agrees.  It would stretch Section 8-208(d) far beyond its plain language to read it as the grant of an affirmative and unconditional right for landlords to charge late fees subject to that section's limitations.  Instead, the Court reads Section 8-208(d) as a limitation on landlords' ability to charge late fees in the context of a broader statutory scheme that is clearly meant to protect tenants.  That statutory scheme indicates the Legislature's intent to *permit*, rather than preclude, local regulation of late fees.  *See* Md. Code Ann., Real Prop. § 8-208(f) ("No provision of this section shall be deemed to be a bar to the applicability of supplementary rights afforded by . . . any ordinance or local law enacted by any municipality or political subdivision of this State; provided, however, that no such law can diminish or limit any right or remedy granted under the provisions of this section.").

"Implied preemption occurs when a local law 'deals with an area in which the State Legislature has acted with such force that an intent by the State to occupy the entire field must be implied.'"  *Chaney Enters.*, 414 Md. at 541 (quoting *Talbot Cnty. v. Skipper*, 329 Md. 481, 488 (1993) (alterations and citation omitted)).  The "primary indicia of legislative purpose to pre-empt

an entire field of law is the comprehensiveness with which the General Assembly has legislated that field." *Id.* (quoting *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 299 (1993)).   For the same reason explained above, the statutory scheme implies the State's intention to allow, rather than prohibit, local regulation in the areas addressed by the statute.

Nonetheless, Plaintiffs argue that the State's intention to occupy the field of landlord late fee regulation is further implied by its grant of regulatory authority to the Governor, who then suspended portions of "Sections 8-401 and 8-402.1 of the Real Property Article[,]" and certain late fees in other industries.  ECF 97-1 at 47-48.  Plaintiffs argue that "[h]e could have suspended late fees under Section 8-208(d)(3), but chose not to do so."  *Id.* at 48.  Therefore, according to the Plaintiffs, "implied preemption here exists not solely by virtue of comprehensive State legislative action concerning the landlord-tenant relationship, but also by virtue of comprehensive executive action (statutorily authorized by the Legislature) to suspend certain aspects of the landlord-tenant relationship."  *Id.*

Simply put, none of this indicates the Legislature's intent to occupy the entire field of landlord-tenant late fee regulation.  If anything, as explained above, the statutory scheme specifically envisions local regulation of the issues addressed in the written lease requirements section of the Real Property Article.  *See* Md. Code Ann., Real Prop. § 8-208(f).  And the Legislature's delegation of authority to the Governor was almost certainly an effort to arm him with adequate authority to protect Marylanders during a novel and rapidly changing global pandemic (occurring at the tail-end of the General Assembly's annual 90-day legislative session). It says nothing, however, about the Legislature's intention to occupy the entire field of late fee regulation.

The Defendants' Motions will, therefore, be granted as to Count 10, and the Plaintiffs' Cross-Motions will be denied.

### H.  Count 11: Declaratory Judgment

The Plaintiffs' request for a declaratory judgment in this case appears entirely duplicative of their substantive claims in Counts 1-10, addressed above.  *See Championship Tournaments, LLC v. United States Youth Soccer Ass'n, Inc.*, No. SAG-18-2580, 2019 WL 6895876, at *2 (D. Md. Dec. 18, 2019) (a declaratory judgment was unnecessary where the claim for declaratory relief was "entirely duplicative" of the plaintiff's breach of contract claims).  The Fourth Circuit has held that, "the principal criteria in favor of granting declaratory judgments are: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *Id.* (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 323 (4th Cir. 1937)); *see Reyazuddin v. Montgomery Cnty., Maryland*, 754 Fed. App'x 186, 192-93 (4th Cir. 2018). Because the legal relations are settled by the Court's disposition of the Plaintiffs' substantive claims as described herein, there does not appear to be any need to award declaratory relief.

However, because the parties' motions seek summary judgment with respect to liability only, and because a declaratory judgment is a remedy rather than an independent source of liability, the Court will deny both parties' motions with respect to Count 11.  *See CGM, LLC v. BellSouth Telecommunications, Inc.*, 664 F.3d 46, 55 (4th Cir. 2011) (the Declaratory Judgment Act "is remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights."). If, at the remedy stage of these proceedings, a declaratory judgment becomes necessary to effectuate any relief to which the Plaintiffs are entitled, the Court will consider, at that time, whether a declaratory judgment is necessary and appropriate.

31

## IV.   CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment, ECF 91, will be GRANTED in part and DENIED in part, and the Plaintiffs' Cross-Motions for Summary Judgment will also be GRANTED in part and DENIED in part.  A separate order follows.


Dated: September 27, 2021                                  _____/s/_____
                                                         Stephanie A. Gallagher
                                                         United States District Judge